In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 19-1738

ALI GADELHAK, on behalf of himself
and all others similarly situated,

*Plaintiff-Appellant,*

*v.*

AT&T SERVICES, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cv-1559 — **Edmond E. Chang**, *Judge.*

---

ARGUED SEPTEMBER 27, 2019 — DECIDED FEBRUARY 19, 2020

---

Before WOOD, *Chief Judge*, and KANNE and BARRETT, *Circuit Judges*.

BARRETT, *Circuit Judge*. The wording of the provision that we interpret today is enough to make a grammarian throw down her pen. The Telephone Consumer Protection Act bars certain uses of an "automatic telephone dialing system," which it defines as equipment with the capacity "to store or produce telephone numbers to be called, using a random or

sequential number generator," as well as the capacity to dial those numbers. We must decide an issue that has split the circuits: what the phrase "using a random or sequential number generator" modifies.

We'll save the intense grammatical parsing for the body of the opinion—here, we'll just give the punchline. We hold that "using a random or sequential number generator" modifies both "store" and "produce." The system at issue in this case, AT&T's "Customer Rules Feedback Tool," neither stores nor produces numbers using a random or sequential number generator; instead, it exclusively dials numbers stored in a customer database. Thus, it is not an "automatic telephone dialing system" as defined by the Act—which means that AT&T did not violate the Act when it sent unwanted automated text messages to Ali Gadelhak.

## I.

This dispute stems from AT&T's "Customer Rules Feedback Tool," a device that sends surveys to customers who have interacted with AT&T's customer service department. Using this tool, AT&T sent Chicago resident Ali Gadelhak five text messages asking survey questions in Spanish. But Gadelhak is neither an AT&T customer nor a Spanish speaker, and his number is on the national "Do Not Call Registry." Annoyed by the texts, Gadelhak brought a putative class action against AT&T for violating the Telephone Consumer Protection Act, which Congress enacted in 1991 to address the problem of intrusive telemarketing.

With some exceptions not relevant here, the Act prohibits the use of an "automatic telephone dialing system" to call or text any cellular phone without the prior consent of the

recipient, as well as to call certain hospital numbers. 47 U.S.C. § 227(b)(1). An "automatic telephone dialing system" is defined as:

> equipment which has the capacity—
>
> (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
>
> (B) to dial such numbers.

*Id.* § 227(a)(1); *see also Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016) (clarifying that text messages are covered). The success of Gadelhak's suit depends on whether AT&T's feedback tool meets this definition. Unfortunately, the awkward statutory wording, combined with changes in technology, makes this a very difficult question.

At the time that the Telephone Consumer Protection Act was passed, telemarketers primarily used systems that randomly generated numbers and dialed them, and everyone agrees that such systems meet the statutory definition. But that's not how AT&T's customer feedback tool works. The system, like others commonly used today, pulls and dials numbers from an existing database of customers rather than randomly generating them. (Given that its tool pulls exclusively from its customer database, AT&T posits that Gadelhak received messages because of a typographical error.) Determining whether such systems meet the statutory definition has forced courts to confront an awkwardness in the statutory language that apparently didn't matter much when the statute was enacted: it's not obvious what the phrase "using a random or sequential number generator" modifies. The answer to that question dictates whether the definition captures

only the technology that predominated in 1991 or is broad enough to encompass some of the modern, database-focused systems.

II.

Before we analyze the merits, though, we must address the preliminary matter of Gadelhak's standing to bring this suit. The doctrine of standing is rooted in Article III of the U.S. Constitution, which limits the federal judicial power to resolving "Cases" or "Controversies." U.S. CONST. art. III, § 2. To satisfy the standing requirement, the plaintiff must claim "to have suffered an injury that the defendant caused and the court can remedy." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019). If a plaintiff lacks standing, a federal court lacks jurisdiction.

While AT&T does not challenge Gadelhak's standing, we have an independent obligation to confirm our jurisdiction before adjudicating a case. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). To be sure, the obligation to verify our jurisdiction in every case does not mean that we have to discuss it in every opinion. Here, though, the question whether plaintiffs like Gadelhak have standing is difficult enough to have divided the circuits. The Eleventh Circuit has held that the receipt of an unwanted automated text message is not a cognizable injury under Article III because it is insufficiently "concrete." *Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019). The Second and Ninth Circuits have come out the other way. *Melito v. Experian Mtkg. Sols., Inc.*, 923 F.3d 85, 92–93 (2d Cir. 2019); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1042–43 (9th Cir. 2017). Given the split, it is important for us to show our work.

To qualify as "concrete," an injury must be "real" rather than "abstract"—that is, "it must actually exist." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). A "bare procedural violation" does not qualify, even if it gives rise to a statutory cause of action. *Id.* at 1549. That is so because Article III cabins Congress's authority to create causes of action, and suits involving abstract injuries lie beyond "the judicial Power." U.S. CONST. art. III, § 1. Thus, Gadelhak's standing to sue is not settled by the fact that the Telephone Consumer Protection Act authorizes his suit. *See* 47 U.S.C. § 227(b)(3). It depends on whether the unwanted texts from AT&T caused him concrete harm or were merely a technical violation of the statute.

To determine whether the texts caused concrete harm, we look to both history and Congress's judgment. As the Court has explained, "it is instructive to consider whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 136 S. Ct. at 1549. And because Congress is particularly suited "to identify intangible harms that meet minimum Article III requirements, its judgment is also instructive and important." *Id.*

We'll start with history. The common law has long recognized actions at law against defendants who invaded the private solitude of another by committing the tort of "intrusion upon seclusion." RESTATEMENT (SECOND) OF TORTS § 652B (AM. LAW INST. 1977). In rejecting standing in a similar case, the Eleventh Circuit suggested that the tort of intrusion upon seclusion addressed only invasions of privacy like eavesdropping and spying, which pose a different kind of harm altogether. *Salcedo*, 936 F.3d at 1171. We see things differently. Courts have also recognized liability for intrusion upon

seclusion for irritating intrusions—such as when "telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff." RESTATEMENT § 652B cmt. d; *see id.* cmt. b, illus. 5; *see also Carey v. Statewide Fin. Co.*, 223 A.2d 405, 406–07 (Conn. Cir. Ct. 1966); *Housh v. Peth*, 133 N.E.2d 340, 344 (Ohio 1956); *Household Credit Servs., Inc. v. Driscol*, 989 S.W.2d 72, 84–85 (Tex. App. 1998). The harm posed by unwanted text messages is analogous to that type of intrusive invasion of privacy.

Now, for Congress's judgment. In passing the Act, Congress decided that automated telemarketing can pose this same type of harm to privacy interests. Pub. L. No. 102-243, § 2, 105 Stat. 2394, 2394 (1991) (explaining in the findings that "[u]nrestricted telemarketing … can be an intrusive invasion of privacy" and characterizing telemarketing as a "nuisance"). While Congress cannot transform a non-injury into an injury on its say-so, that is hardly what it did here. Instead, Congress identified a modern relative of a harm with long common law roots. And Gadelhak claims to have suffered the very harm that the Act is designed to prevent. *Cf. Melito*, 923 F.3d at 92–93 (reaching the same conclusion).[1]

---

[1] The Eleventh Circuit maintains that Congress was concerned with the harm posed by unwanted telephone calls, not text messages. *Compare Salcedo*, 936 F.3d at 1172 (no standing in a TCPA suit over an unwanted text message), *with Cordoba v. DirectTV, LLC*, 942 F.3d 1259, 1270 (11th Cir. 2019) (finding injury-in-fact in a TCPA suit alleging unwanted calls). We don't share the view that the two are "categorically distinct." *Salcedo*, 936 F.3d at 1172. The undesired buzzing of a cell phone from a text message, like the unwanted ringing of a phone from a call, is an intrusion into peace and quiet in a realm that is private and personal. This is the very harm that Congress addressed.

The Eleventh Circuit treated the injury in its case as abstract partly because common law courts generally require a much more substantial imposition—typically, many calls—to support liability for intrusion upon seclusion. *See, e.g.*, *Sofka v. Thal*, 662 S.W.2d 502, 511 (Mo. 1983). But when *Spokeo* instructs us to analogize to harms recognized by the common law, we are meant to look for a "close relationship" in kind, not degree. *See* 136 S. Ct. at 1549. In other words, while the common law offers guidance, it does not stake out the limits of Congress's power to identify harms deserving a remedy. Congress's power is greater than that: it may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* (alteration in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 578 (1992)). A few unwanted automated text messages may be too minor an annoyance to be actionable at common law. But such texts nevertheless pose the same *kind* of harm that common law courts recognize—a concrete harm that Congress has chosen to make legally cognizable.[2] *Van Patten*, 847 F.3d at 1043.

---

[2] The Eleventh Circuit arguably limited its holding to the receipt of one text message in violation of the Act, *see Salcedo*, 936 F.3d at 1174 (J. Pryor, J., concurring in judgment only), suggesting that it might come out differently in a case in which a greater number of texts strengthened the analogy to the common law tort. The Second Circuit, by contrast, did not even mention the number of texts at issue in *Melito*, 923 F.3d at 92–93, and the Ninth Circuit held that standing existed in *Van Patten* when the defendant allegedly sent only two texts, 847 F.3d at 1041–43. For the reasons we've explained, we agree with the Second and Ninth Circuits that the number of texts is irrelevant to the injury-in-fact analysis.

We therefore agree with the Second and Ninth Circuits that unwanted text messages can constitute a concrete injury-in-fact for Article III purposes.

### III.

With standing out of the way, we turn to the merits. We previously addressed the same provision in *Blow v. Bijora, Inc.*, 855 F.3d 793 (7th Cir. 2017), but at that time, a 2015 FCC Order interpreting the Act was on the books. We held that "absent a direct appeal to review the 2015 FCC Order's interpretation," the Hobbs Act required us to adopt the FCC's definition of an "automatic telephone dialing system." *Id.* at 802; *see* 28 U.S.C. § 2342(1). But since we decided *Blow*, there has been just such a "a direct appeal to review" the FCC Order: the D.C. Circuit struck down the 2015 FCC interpretation in *ACA International v. FCC*, 885 F.3d 687, 695 (D.C. Cir. 2018). And contrary to Gadelhak's assertion, *ACA International* did not leave prior FCC Orders intact. Instead, the D.C. Circuit clarified that its review also covered "the agency's pertinent pronouncements"—its prior Orders. *Id.* at 701. Neither *Blow* nor any FCC Order binds us in this case. *See Glasser v. Hilton Grand Vacations Co.*, Nos. 18-14499 & 18-14586, 2020 WL 415811, at *6 (11th Cir. Jan. 27, 2020); *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049–50 (9th Cir. 2018); *see also Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018) (implicitly reaching the same conclusion by declining to defer to any FCC Order). We therefore interpret the statute's text as though for the first time.

There are at least four ways of reading the statutory definition of an "automatic telephone dialing system." First, the phrase "using a random or sequential number generator" might modify both *store* and *produce*, which would mean that

a device must be capable of performing at least one of those functions using a random or sequential number generator to qualify as an "automatic telephone dialing system." This is how the Third and Eleventh Circuits interpret the statute. *Dominguez*, 894 F.3d at 119; *Glasser*, 2020 WL 415811, at *2.[3] Second, the phrase might describe the *telephone numbers* themselves, specifying that the definition captures only equipment that dials randomly or sequentially generated numbers. This is how the district court interpreted the provision. Third, the phrase might limit only the word *produce*, which would mean that the definition captures not only equipment that can produce numbers randomly or sequentially, but also any equipment that can simply store and dial numbers. This is the Ninth Circuit's interpretation. *Marks*, 904 F.3d at 1052. Finally, the phrase could describe the manner in which the telephone numbers are *to be called*, regardless of how they are stored, produced, or generated. Some courts—including the district court in this case—have alluded to this possibility, although none has adopted it. *See, e.g.*, *Glasser*, 2020 WL 415811, at *7.

---

[3] In *Dominguez v. Yahoo, Inc.* (*Dominguez II*), the Third Circuit explained that after *ACA International*, it would revert to the interpretation it had adopted before the 2015 FCC Order. 894 F.3d at 119. Before the Order, the court had held that the definition covered equipment that "may have the capacity to store or to produce the randomly or sequentially generated numbers to be dialed," and then asked the district court on remand to consider how a number can be stored using a random number generator. *Dominguez v. Yahoo, Inc.* (*Dominguez I*), 629 F. App'x 369, 372 n.1 (3d Cir. 2015) (emphasis omitted). *Dominguez I* is not perfectly clear about which interpretation it applies, but the remand suggests that it reads "using a random or sequential number generator" to describe how the numbers may be stored or produced—consistent with the first interpretation that we summarize.

A.

We begin with the interpretation adopted by the Third and Eleventh Circuits. Under their reading, the phrase "using a random or sequential number generator" modifies both "store" and "produce," defining the means by which either task must be completed for equipment to qualify as an "automatic telephone dialing system." That is, the statute addresses:

> equipment which has the capacity—
>
> (A) to *store* or *produce* telephone numbers to be called, *using a random or sequential number generator*; and
>
> (B) to dial such numbers.

AT&T advocates this reading, which would exclude its customer feedback tool because the tool lacks the capacity either to store or to produce telephone numbers using a number generator. Instead, the tool dials numbers only from a customer database.

This interpretation is certainly the most natural one based on sentence construction and grammar. As the Eleventh Circuit explained, "[w]hen two conjoined verbs ('to store or produce') share a direct object ('telephone numbers to be called'), a modifier following that object ('using a random or sequential number generator') customarily modifies both verbs." *Glasser*, 2020 WL 415811, at *2. The placement of the comma before "using a random or sequential number generator" in the statute further suggests that the modifier is meant to apply to the entire preceding clause. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 150 (2012). That clause is driven by the two

verbs, "to store or produce." The sentence's construction thus seems to encourage applying the phrase "using a random or sequential number generator" to both verbs.

But this first interpretation runs into a problem: as one district court wrote, "it is hard to see how a number generator could be used to 'store' telephone numbers." *Pinkus v. Sirius XM Radio, Inc.*, 319 F. Supp. 3d 927, 938 (N.D. Ill. 2018). AT&T counters that a device that generates random numbers and then dials them does, technically, "store" such a number for the fleeting interval between those two functions. While that may be true as a technical matter, as a matter of ordinary usage it's hard to say that the random number generator is "storing" in any notable way. More persuasive, however, is the point that some systems "store" randomly generated numbers for much longer than a few fleeting moments. The record before the FCC reveals that at the time of the statute's enactment, devices existed with the capacity to generate random numbers and then store them in a file for a significant time before selecting them for dialing.[4] *See* Noble Systems Corp., Comments in Response to the FCC's Request for Comments of the Interpretation of the TCPA in Light of the 9th Circuit's Decision in *Marks v. Crunch San Diego* 12–15 (Oct. 16, 2018), https://ecfsapi.fcc.gov/file/1016271761504/Noble_System_Comments_FCC_DA18-1014_FINAL.pdf. The capacity for storage is more central to such a device's function.

Gadelhak responds that if the Act had meant to capture random-generation devices defined by their storage

---

[4] For a more fulsome history of the statute and the FCC's regulations interpreting it, see both *Glasser*, 2020 WL 415811, at *4–5, and *Marks*, 904 F.3d at 1043–48.

capacities, it needn't have used the word "store" at all. After all, such a device also necessarily can "produce" numbers using a number generator, rendering the "store" option in the statute superfluous. That surplusage is not a deal-breaker. *See* SCALIA & GARNER, *supra*, at 176–77 ("Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance, either out of a flawed sense of style or to engage in the ill-conceived but lamentably common belt-and-suspenders approach."). Given the range of storage capacities among telemarketing devices at the time of enactment, it is plausible that Congress chose some redundancy in order to cover "the waterfront." *Glasser*, 2020 WL 415811, at *3.

Notwithstanding the difficulties posed by this interpretation, we think that the language bears it. But because of those difficulties, we proceed to consider whether any of the other possibilities fares better.

B.

The district court favored the next option: that "using a random or sequential number generator" modifies the "telephone numbers" that are dialed. Since the telephone numbers themselves obviously lack the capacity to "us[e]" a number generator, the phrase really describes the means by which telephone numbers are *generated*, as follows:

> equipment which has the capacity—
>
> (A) to store or produce *telephone numbers* to be called, *[generated] using a random or sequential number generator*; and
>
> (B) to dial such numbers.

Under this interpretation, an "automatic telephone dialing system" is equipment with the capacity to store or produce telephone numbers generated using a random or sequential number generator as well as the capacity to dial those numbers. Because AT&T's system cannot generate random strings of numbers for itself and instead dials only existing numbers from AT&T accounts, the district court held that it could not satisfy the statutory definition.

The district court's interpretation avoids the problems associated with the word "store." But it has a problem of its own: the grammatical structure of the sentence. The phrase "using a random or sequential number generator" is an adverbial phrase with an elided preposition—it means "[by] using a random or sequential number generator." As an adverbial phrase that describes how something is to be done, it cannot modify a noun in this context. So, to arrive at its reading, the district court had to insert a significant word into the statute that simply isn't there. Although the district court's version of the statute is clearer and therefore tempting, "our task is to interpret the words of Congress, not add to them." *Evans v. Portfolio Recovery Assocs., LLC*, 889 F.3d 337, 346 (7th Cir. 2018) (citation omitted). The words of Congress, as written, do not permit this second interpretation.

## C.

Gadelhak presses the third option: that the phrase "using a random or sequential number generator" modifies only the equipment's capacity to "produce." With emphasis, the definition would read:

> equipment which has the capacity—

> (A) to store or *produce* telephone numbers to be called, *using a random or sequential number generator*; and
>
> (B) to dial such numbers.

To Gadelhak, it doesn't matter that AT&T's system cannot generate random or sequential ten-digit numerical strings. As he sees it, the capacity to produce numbers using a random number generator is only one means of meeting the statutory definition. Gadelhak argues that the disjunctive "or" in "store or produce" means that an "automatic telephone dialing system" need not produce numbers at all. Since "using a random or sequential number generator" modifies only "produce," Gadelhak argues that all equipment with the capacity to store telephone numbers to be called and to dial those numbers qualifies as an automatic telephone dialing system. This is the interpretation that the Ninth Circuit adopted in *Marks v. Crunch San Diego*.

This interpretation eliminates the problem of the first one—that the phrase is an admittedly imperfect fit for the verb "store." And it does not require us to add a word to the statute as the second one does. But Gadelhak's approach has a fatal flaw of its own: it requires us to contort the statutory text almost beyond recognition. Everyone agrees that "telephone numbers to be called" is the object of both "store" and "produce." That makes sense because "produce" is not set off from "store" in the text, either with the infinitive "to" or with a comma. *See* SCALIA & GARNER, *supra*, at 148–49. It would be unnatural, then, to splice "store" and "produce" to have the final phrase, "using a random or sequential number generator," modify only the latter verb. Gadelhak asks us to reorder the sentence to separate "store" and "produce" but to clarify

that "telephone numbers" is the object of both. That would be a significant judicial rewrite.

Nonetheless, Gadelhak maintains that the statutory structure requires this reading. He emphasizes that the statute carves out a defense for recipients who have given their prior express consent. *See* 47 U.S.C. § 227(b)(1)(A) (authorizing the use of an automatic telephone dialing system for calls or texts "made with the prior express consent of the called party"). If an "automatic telephone dialing system" is defined by its capacity to generate numbers at random, Gadelhak says, it would be impossible for a party ever to take advantage of the consent defense except by coincidence. He explains that a caller could not know in advance whether the telephone number, having been randomly generated, would belong to a party who had previously consented to being called. *See also Marks*, 904 F.3d at 1051 (adopting this argument). But as another court explained, "it is possible to imagine a device that both has the capacity to generate numbers randomly or sequentially and can be programmed to avoid dialing certain numbers …." *Pinkus*, 319 F. Supp. 3d at 939. Gadelhak's rationale for choosing an atextual interpretation is therefore unpersuasive.

Gadelhak has one last card to play: he insists that Congress blessed his interpretation of the statute when it amended the Act in 2015. At that time, the D.C. Circuit had not yet struck down the 2015 FCC Order interpreting the statute in Gadelhak's favor. Gadelhak asserts that Congress essentially ratified that interpretation when it amended the statute in 2015 to add an exception for government debt collection and declined to amend the definition in any other respect. *See* Pub. L. No. 114-74, § 301, 129 Stat. 584, 588 (2015). We reject

this argument, as has every circuit to consider it. *See Glasser*, 2020 WL 415811, at *6 (collecting cases). Congressional failure to act does not necessarily reflect approval of the status quo. *See Alexander v. Sandoval*, 532 U.S. 275, 292 (2001). And in any event, the FCC's interpretation of the statute was hardly settled at the time of the congressional amendment—in 2015, the D.C. Circuit was already reviewing *ACA International*. It is therefore particularly difficult to attribute acquiescence to Congress's actions that year.

Finally, it is worth noting the far-reaching consequences of Gadelhak's ungrammatical interpretation: it would create liability for every text message sent from an iPhone. That is a sweeping restriction on private consumer conduct that is inconsistent with the statute's narrower focus. Gadelhak argues that to qualify as an "automatic telephone dialing system" a device need only have the "capacity … to store … telephone numbers" and then to call or text them automatically. Every iPhone today has that capacity right out of the box. An iPhone of course can store telephone numbers; it can also send text messages automatically, for example by using the "Do Not Disturb While Driving" function. *See How to Use Do Not Disturb While Driving*, APPLE (Sept. 19, 2019), https://support.apple.com/en-us/HT208090 ("If someone sends you a message [while this feature is turned on], they receive an automatic reply letting them know that you're driving."). Every iPhone, then, has the necessary capacities to meet the statutory definition. That means that under Gadelhak's interpretation, every call or text message sent from an iPhone without the prior express consent of the recipient could subject the sender to a $500 fine. *See* 47 U.S.C. § 227(b)(3)(B). Considering the statute as a whole, that result makes little sense. The Act's other provisions address narrow conduct much more likely to

be performed by telemarketers than by private citizens—for example, the use of "an artificial or prerecorded voice." *Id.* § 227(b)(1)(A). The definition of an "automatic telephone dialing system" would be an outlier within the statutory scheme if it were to capture such a wide swath of everyday conduct.

D.

There is one final possibility: that "using a random or sequential number generator" modifies how the telephone numbers are "to be called." On this reading, an "automatic telephone dialing system" is:

> equipment which has the capacity—
>
> (A) to store or produce telephone numbers *to be called[] using a random or sequential number generator*; and
>
> (B) to dial such numbers.

In other words, the definition captures devices with the capacity to store or to produce telephone numbers that will be dialed by a random or sequential number generator. The record does not fully explain whether AT&T's system has the necessary capabilities to be considered an "automatic telephone dialing system" under this definition; neither party advanced this reading and other courts have only danced around it. *See*, *e.g.*, *Glasser*, 2020 WL 415811, at *7 (identifying this interpretation as "plausible" but rejecting it without comment).

A close look convinces us that this fourth possibility is also inferior to the first interpretation. Congress chose to insert a comma between "to be called" and "using a random or

sequential number generator." And "[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one." WILLIAM N. ESKRIDGE JR., INTERPRETING LAW: A PRIMER ON HOW TO READ STATUTES AND THE CONSTITUTION 67–68 (2016) (citation omitted). The comma separating "to be called" and "using a random or sequential number generator" therefore indicates that the modifier refers to the entire clause that precedes it—a clause driven by the verbs "store" and "produce"—rather than the phrase immediately adjacent to it.

Of course, we are mindful that "a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning." *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 454 (1993). We tread especially carefully here, since the comma seems to be ungrammatical under any interpretation. As mentioned above, "using a random or sequential number generator" is an adverbial phrase. To be more specific, it is a *restrictive* adverbial phrase, because it provides information that is essential to the meaning of the sentence. The grammar and style treatise of record dictates that a comma is inappropriate for a restrictive adverbial phrase found at the end of a sentence. THE CHICAGO MANUAL OF STYLE ¶ 6.31 (17th ed. 2017).

But we have reason to be confident that the comma before the modifier deliberately separates it from "to be called." A modifying clause following a comma tends not to modify the very last antecedent before it when that antecedent is "integrated" into a singular unit. *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1077 (2018) (citation omitted). In the

context of autodialing, the phrase "telephone numbers to be called" has consistently been used as an integrated unit. A 1986 patent for a method of randomizing telephone numbers, for example, contains five references to "numbers to be called." U.S. Patent No. 4,741,028 (filed July 30, 1986). The phrase was also common in the state antitelemarketing statutes that preceded the federal legislation. Across statutes with different sentence structures and different scopes, the phrase "telephone numbers to be called" appears again and again. *See, e.g.*, MASS. GEN. LAWS ch. 159 § 19B (1986); MISS. CODE ANN. § 77-3-451 (1989); N.Y. GEN. BUS. LAW § 399-p (1988). These uses suggest that "telephone numbers to be called" is a single noun unit characterized by the purpose of the numbers. The comma, therefore, seems to have been a deliberate drafting choice to separate the modifying clause from the words that immediately precede it.

Satisfied that "using a random or sequential number generator" does not describe how the numbers are "to be called," we are left again with the first interpretation. It is admittedly imperfect. But it lacks the more significant problems of the other three interpretations and is thus our best reading of a thorny statutory provision. We therefore hold that the phrase "using a random or sequential number generator" describes how the telephone numbers must be "stored" or "produced."

\* \* \*

The district court held that AT&T's system did not qualify as an "automatic telephone dialing system" because it lacked the capacity to generate random or sequential numbers. Although we adopt a different interpretation of the statute, under our reading, too, the capacity to generate random or

sequential numbers is necessary to the statutory definition. The district court's judgment is therefore AFFIRMED.