In the

# United States Court of Appeals
## for the Seventh Circuit

———————————

No. 22-1202

MARY C. NABOZNY, on behalf of herself
and others similarly situated,

*Plaintiff-Appellant*,

*v.*

OPTIO SOLUTIONS LLC d/b/a
QUALIA COLLECTION SERVICES,

*Defendant-Appellee*.

———————————

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 21-cv-297 — **James D. Peterson**, *Chief Judge*.

———————————

ARGUED SEPTEMBER 29, 2022 — DECIDED OCTOBER 23, 2023

———————————

Before SYKES, *Chief Judge*, and ROVNER and JACKSON-AKIWUMI, *Circuit Judges*.

SYKES, *Chief Judge*. Optio Solutions LLC sent Mary Nabozny a letter seeking to collect a defaulted credit-card debt. Optio used RevSpring, Inc., a third-party mail vendor, to print and send the letter. Nabozny responded with this lawsuit accusing Optio of violating the Fair Debt Collection

Practices Act ("FDCPA" or "the Act"), 15 U.S.C. §§ 1692 *et seq.* She claims that by using a third-party vendor to print and mail the letter, Optio violated § 1692c(b) of the Act, which bars debt collectors from communicating with anyone other than the debtor when attempting to collect a consumer debt. (There are several exceptions, but none apply here.) Nabozny proposes to represent a class of debtors who received similar letters from Optio.

This lawsuit suffers from a jurisdictional defect: Nabozny sustained no injury from the alleged statutory violation. The district judge accordingly dismissed the suit for lack of standing. *Nabozny v. Optio Sols., LLC*, 583 F. Supp. 3d 1209, 1215 (W.D. Wis. 2022). Nabozny appealed.

After the parties filed their briefs, the Eleventh Circuit addressed a materially identical FDCPA case and rejected a standing argument much like the one Nabozny makes here. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236 (11th Cir. 2022) (en banc). Sitting en banc and applying the Supreme Court's instructions in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), the Eleventh Circuit held that this kind of § 1692c(b) violation—sharing a debtor's data with a third-party mail vendor to populate and send a form collection letter—causes no harm that our legal tradition recognizes as sufficient to support a suit in federal court under Article III of the Constitution. *Hunstein*, 48 F.4th at 1245. The Tenth Circuit has since reached the same conclusion. *Shields v. Pro. Bureau of Collections of Md., Inc.*, 55 F.4th 823, 828–29 (10th Cir. 2022) (adopting the reasoning of *Hunstein*). We agree with our sister circuits and affirm the dismissal of Nabozny's suit.

## I. Background

We take the following factual allegations from Nabozny's class-action complaint, accepting them as true for present purposes. In July 2020 Nabozny received a letter at her home in Ashland County, Wisconsin, offering to settle an unpaid credit-card debt. The letter summarized basic information about her debt: the creditor, the outstanding balance, the account number, and her name and address. The letter was from Optio Solutions under its operating name of Qualia Collection Services, but it was printed and mailed by RevSpring, Inc., a third-party printing and mail vendor. Nabozny did not give Optio consent to share the information about her debt with RevSpring.

Nabozny sued Optio alleging that its communication with RevSpring, the third-party mail vendor, violated § 1692c(b) of the FDCPA, which provides that "a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer" without the consumer's consent. (There are a few exceptions—e.g., the statute exempts communications with the debtor's attorney and the creditor and its attorney. None of the exceptions are relevant here.) Nabozny's lawsuit was styled as a proposed class action: she sought to represent a class of other Wisconsin residents who had received similar collection letters from Optio via RevSpring.

Optio moved to dismiss for lack of jurisdiction, arguing that Nabozny lacks standing to sue because the alleged statutory violation, even if it occurred, caused her no injury. Nabozny responded, urging the court to follow a then-recent decision by an Eleventh Circuit panel that had found stand-

ing in a nearly identical § 1692c(b) case. *See Hunstein v. Preferred Collection & Mgmt. Servs, Inc.*, 994 F.3d 1341 (11th Cir. Apr. 21, 2021), *vacated and superseded on reh'g*, 17 F.4th 1016 (11th Cir. Oct. 28, 2021), *reh'g en banc granted*, 17 F.4th 1103 (11th Cir. Nov. 17, 2021).

The *Hunstein* panel opinion had a short shelf life. By the time the district court addressed Optio's motion, the full Eleventh Circuit had agreed to hear *Hunstein* en banc. Accordingly, the judge declined Nabozny's invitation to follow the now-vacated Eleventh Circuit panel opinion in *Hunstein*. *Nabozny*, 583 F. Supp. 3d at 1214 & n.2. The judge instead dismissed Nabozny's suit for lack of subject-matter jurisdiction, holding that Nabozny lacks standing to sue because she "suffered no concrete injury." *Id.* at 1215.

## II. Discussion

Article III of the Constitution limits the federal judicial power to resolving "Cases" and "Controversies," U.S. CONST. art. III, § 2, a principle long understood to confine the federal judiciary to its "constitutionally limited role of adjudicating actual and concrete disputes" presented in a form traditionally recognized as appropriate for judicial decision and the resolution of which will "have direct consequences on the parties involved," *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013). An essential component of the case-or-controversy limitation is the requirement that a plaintiff have standing to sue—that is, a "personal stake" in the outcome of the suit sufficient to engage the jurisdiction of the federal court. *TransUnion*, 141 S. Ct. at 2203.

To establish standing, the "plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and

actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* Without "an injury that the defendant caused and the court can remedy, there is no case or controversy" under Article III. *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019).

As the party seeking to invoke federal jurisdiction, Nabozny bears the burden of establishing her standing to sue. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Pierre v. Midland Credit Mgmt.*, 29 F.4th 934, 939 (7th Cir. 2022). This case comes to us from a dismissal at the pleading stage, so it raises a facial challenge to standing. We therefore look to Nabozny's complaint to assess whether her allegations of injury, accepted as true, are sufficient to support her standing to sue. *Flynn v. FCA US LLC*, 39 F.4th 946, 952 (7th Cir. 2022). Our standard of review is de novo. *Id.*

This case turns on the injury-in-fact requirement and, more specifically, whether Nabozny suffered an actual, concrete injury. To be concrete, an injury must be "real, and not abstract." *Spokeo*, 578 U.S. at 340 (quotation marks omitted). Tangible harms like monetary and physical harms are the most obvious, but "[v]arious intangible harms can also be concrete." *TransUnion*, 141 S. Ct. at 2204. When a plaintiff's claim involves an allegation of intangible harm, the injury-in-fact inquiry turns on whether the harm "has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *Id.* (quoting *Spokeo*, 578 U.S. at 341). Examples include reputational harms, privacy harms like intrusion upon seclusion and giving publicity to private information, and "harms specified by the Constitution itself." *Id.*

In some cases, Congress's exercise of its legislative power to promulgate regulatory obligations and create a private cause of action for violations may serve to "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Spokeo*, 578 U.S. at 341 (quotation marks and alteration omitted). The judgment of Congress is "instructive and important," *id.*, but the judiciary has an independent duty to decide whether a plaintiff has suffered an actual injury and thus has a sufficient stake in the outcome to invoke the jurisdiction of a federal court, *TransUnion*, 141 S. Ct. at 2205. Put slightly differently, "Congress's creation of a statutory prohibition or obligation and a cause of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III … ." *Id.* Although "Congress may elevate harms that exist in the real world" to actionable legal status, "it may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *Id.* (quoting *Hagy v. Demers & Adams*, 882 F.3d 616, 622 (6th Cir. 2018)).

Because Article III requires a concrete injury "even in the context of a statutory violation," *Spokeo*, 578 U.S. at 341, legislatively identified intangible harms "must bear a close relationship in kind to those underlying suits at common law." *Pierre*, 29 F.4th at 938. A claimed injury from a statutory violation need not be an "exact duplicate" of a harm traditionally recognized as actionable at common law, but the plaintiff must identify "a close historical or common-law analogue." *TransUnion*, 141 S. Ct. at 2204; *Ewing v. MED-1 Sols., LLC*, 24 F.4th 1146, 1151 (7th Cir. 2022).

Nabozny alleges in her complaint that Optio's violation of § 1692c(b) harmed her by "invading her privacy." She elaborates a bit in her brief, arguing that because Optio disclosed information about her debt to its third-party mail vendor, she suffered a loss of her ability to control her personal financial information. And that harm, she contends, is analogous to the harm caused by a tortious invasion of privacy and thus qualifies as a concrete injury for standing purposes.

We disagree. And we are in good company in rejecting this argument. In *Hunstein*—a materially identical § 1692c(b) case involving a debt collector's use of a third-party mail vendor to process a form collection letter—the en banc Eleventh Circuit considered the privacy-tort analogy in depth and rejected it, concluding that the plaintiff lacked standing to sue because he suffered no cognizable injury from the alleged statutory violation. 48 F.4th at 1241–50. The Tenth Circuit has since endorsed *Hunstein. Shields*, 55 F.4th at 828–29. No other circuit has held to the contrary. It would take a strong reason for us to create a circuit split, and we decline to do so here.

There is no need to repeat the Eleventh Circuit's exhaustive analysis in full; a briefer explanation of our reasoning will suffice. As we've noted, Nabozny generically analogizes her alleged injury to a tortious invasion of privacy, but at common law an invasion of the right to privacy has traditionally encompassed four distinct torts: intrusion upon seclusion, appropriation of another person's name or likeness, publicity given to another person's private life, and publicity that places one in a false light. RESTATEMENT (SECOND) OF TORTS § 652A (AM. LAW INST. 1977).

Looking beyond Nabozny's bare invasion-of-privacy allegation to the relevant factual allegations in her complaint, *see Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1191–92 (7th Cir. 2021), it becomes clear that only one of the four privacy torts is even *potentially* relevant: the tort of publicity given to another person's private life or, as some sources phrase it, the public disclosure of private facts. A person commits this civil wrong if he "gives publicity" to a matter that concerns "the private life of another," is "highly offensive to a reasonable person," and is not of legitimate public concern. RESTATEMENT § 652D.

Nabozny's attempt to analogize her case to this privacy tort falls apart on the threshold element of publicity. *Hunstein*, 48 F.4th at 1245–49. "'Publicity' … means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." RESTATEMENT § 652D cmt. a. Nabozny's complaint is devoid of any allegations that Optio made her private information public. Rather, she alleges no more than the following: Optio disclosed pieces of her private debt information to RevSpring, and RevSpring used this information to populate a form collection letter and sent it to Nabozny. Even as Nabozny sees it, that was the end of the matter. Nothing in the complaint suggests any manner of public disclosure or even that anyone at RevSpring read or appreciated her information. Indeed, the final recipient of the information was Nabozny herself.

The transmission of information to a single ministerial intermediary does not remotely resemble the publicity element of the only possibly relevant variant of the privacy

tort. *See Hunstein*, 48 F.4th at 1245; *Shields*, 55 F.4th at 828–29. Publicity "does not include just '*any* communication by the defendant to a third person.'" *Hunstein*, 48 F.4th at 1246 (quoting RESTATEMENT § 652D cmt. a). Nor is it enough "to communicate a fact concerning the plaintiff's private life … to a small group of persons." RESTATEMENT § 652D cmt. a. To constitute publicity, a communication must "reach[], or [be] sure to reach, the public." *Id.*

The distinction between public and private communication is not just a matter of numbers. "[T]his is a qualitative inquiry, not a quantitative one." *Hunstein*, 48 F.4th at 1246. So while the number of recipients might be a relevant consideration, we must do more than simply count heads. A disclosure might be sure to reach the public, for example, if communicated to a journalist—a single person—for later publication in a newspaper or magazine. *See id.* at 1247. By contrast, there is no "publicity" given to private facts when a creditor writes to a debtor's employer—also a single person—to inform him that the debtor "owes [a] debt and will not pay it." RESTATEMENT § 652D cmt. a, illus. 1. Information can remain private, too, even when disclosed to many. For example, "[w]hen a trade secret is communicated to thousands of new employees after a merger," it does not suddenly "become public information." *Hunstein*, 48 F.4th at 1247. As these illustrations show, when a private communication is sent with no expectation of further disclosure, it is not one that is "sure to reach[] the public." RESTATEMENT § 652D cmt. a. And in that case, there is no actionable "publicity" given to private facts.

Because Nabozny's complaint does not allege that Optio publicized her private information, she has not suffered a

cognizable injury—or as the Eleventh Circuit put it, "at least not one that is at all similar to that suffered after a public disclosure" of private facts. *Hunstein*, 48 F.4th at 1245. The public-disclosure form of the privacy tort protects against the humiliation that accompanies the disclosure of sensitive or scandalizing private information to public scrutiny. *See* RESTATEMENT § 652D cmt. b ("When … intimate details of … life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy … ."). Without a public-exposure component, Nabozny's alleged injury is not analogous to the harm at the core of the public-disclosure tort. Indeed, "having some finite number of people know (true) details about your life is fundamentally different than having that information disseminated to the general public." *Hunstein*, 48 F.4th at 1249.

Nabozny argues that *Hunstein* conflicts with our decision in *Gadelhak v. AT&T Services, Inc.*, 950 F.3d 458 (7th Cir. 2020). In *Gadelhak* we held that analogizing to common-law harms requires us to look only for "a close relationship in kind, not degree." *Id.* at 462 (quotation marks omitted). That remains true even after *TransUnion*. Still, *Hunstein* and *Gadelhak* are easily reconcilable. As we've already explained, "[p]rivate disclosure is not just a less extreme form of public disclosure." *Hunstein*, 48 F.4th at 1249; *see also Shields*, 55 F.4th at 829. Because Nabozny "did not allege any publicity at all, we cannot analyze the degree of that non-publicity." *Hunstein*, 48 F.4th at 1249. In other words, because allegations of publicity are altogether missing from Nabozny's complaint, her injury from the alleged § 1692c(b) violation—if one exists at all—is different *in kind* from that

which the common law traditionally has recognized as actionable.

Nabozny also relies on *Fox v. Dakkota Integrated Systems, LLC*, 980 F.3d 1146 (7th Cir. 2020), and *Cothron v. White Castle System, Inc.*, 20 F.4th 1156 (7th Cir. 2021), but those cases do not help her. *Fox* and *Cothron* raised Article III standing questions in the context of claims under the Illinois Biometric Informational Privacy Act. In *Fox* we recognized that biometric identifiers are uniquely "immutable, and once compromised, are compromised forever." 980 F.3d at 1155. We explained that the unlawful collection or retention of that kind of immutable personal identifying information invades the "private domain, much like an act of trespass." *Id.* (quoting *Bryant v. Compass Grp. USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020)). Debt-related information, by contrast, "is far less identifying," *id.* at 1155 n.2, so the harm from its disclosure is not comparable.

The Court's analysis in *TransUnion* itself bolsters our conclusion. That case involved two large subclasses of plaintiffs in a suit for violation of the Fair Credit Reporting Act ("FCRA"). Both subclasses claimed that TransUnion's internal credit-report files contained misleading information about them—specifically, alerts on their credit reports indicating that their names matched those on a Treasury Department list of "specially designated nationals" considered to be national security threats. 141 S. Ct. at 2201. One subclass included those whose credit reports had been disseminated to potential creditors; the other included those whose credit reports were never shared with anyone outside TransUnion. *Id.* at 2201–02.

For the first subclass of plaintiffs, the Court held that their reputational harm from the disclosure of their misleading credit reports bore a close relationship to the harm caused by the tort of defamation. *Id.* at 2209. Although the information that TransUnion had disseminated was "only misleading and not literally false" (as the common law traditionally requires), the reputational "harm from being labeled a '*potential* terrorist'" sufficiently resembled the harm "from being labeled a 'terrorist.'" *Id.* (emphasis added). So the first group had "suffered a concrete injury under Article III." *Id.*

But for the remaining plaintiffs—those whose credit reports had not been disseminated—the Court held that they had not suffered a concrete injury. "Publication is essential to liability in a suit for defamation." *Id.* (quotation marks omitted). The mere existence or retention of false or misleading information in a database has never been recognized as an actionable tort. *Id.* This is so because the basis of a defamation action is "the loss of credit or fame, and not the insult." *Id.* (quoting J. BAKER, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 474 (5th ed. 2019)). So "the plaintiffs' harm [wa]s roughly the same, legally speaking, as if someone wrote a defamatory letter and then stored it in her desk drawer." *Id.* at 2210. Without disclosure, the letter "does not harm anyone, no matter how insulting [it] is." *Id.*

Nabozny's case is comparable to this second subclass of plaintiffs in *TransUnion*. Public disclosure is the gravamen of the tort of giving publicity to another's private life. But the harm Nabozny claims to have suffered from the alleged § 1692c(b) violation is not remotely analogous to the harm

caused by the tortious *public* dissemination of sensitive facts about another's private life.

Another aspect of *TransUnion* supports our decision here. In dicta the Supreme Court doubted whether the common law had traditionally recognized as "actionable publications" disclosures to "vendors that print[] and sen[d] … mailings." *TransUnion*, 141 S. Ct. at 2210 n.6. Although the Court made this observation in analogizing the harm from the alleged FCRA violations to the tort of defamation, its logic extends to this appeal. The "publication" element in a defamation claim includes disclosure to just one person, while the "publicity" element of the privacy tort at issue here requires disclosure to many. Restatement § 652D cmt. a. If a disclosure to a mail vendor is not "a publication" for defamation purposes, it also cannot be "publicity" for purposes of the tort of giving publicity to another's private life.

*TransUnion* emphatically reminded us that "under Article III, an injury in law is not an injury in fact." 141 S. Ct. at 2205. As both *Spokeo* and *TransUnion* make clear, Congress's enactment of statutory obligations and a private cause of action for violations does not displace or dilute Article III limitations on our jurisdiction. "A regime where Congress could freely authorize *unharmed* plaintiffs to sue defendants who violate federal law not only would violate Article III but also would infringe on the Executive Branch's Article II authority." *TransUnion*, 141 S. Ct. at 2207. Among other concerns, "[p]rivate plaintiffs are not accountable to the people and are not charged with pursuing the public interest in enforcing a defendant's general compliance with regulatory law." *Id.* (citing *Lujan*, 504 U.S. at 577). To enforce

the separation-of-powers boundaries in our constitutional structure, "[o]nly those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* at 2205.

Because Nabozny suffered no concrete injury from the FDCPA violation she alleges here, she lacks standing to sue. The judge was right to dismiss her suit.

AFFIRMED